### TAYLOR v. HOTCHKISS et al.

(Supreme Court, Appellate Division, Fourth Department. March 10, 1903.)

1. COMPROMISE WITH CREDITORS—RELEASE—MORAL OBLIGATION—CONSIDERA-
TION.

In attempting to settle with its creditors, a firm sent a creditor a letter proposing that he take certain securities at an arbitrary valuation of 80 per cent., which would furnish payment in full of his claim, further stating that they proposed to offer their moral obligation to take the securities back at 80 per cent. at or before a named date, and devote every effort to collect debts due them, and that personal assets of the writer would be used for the same purpose, and concluding as follows: "Your approval and acceptance of this plan will do much in aiding us to carry out this settlement." The securities were accepted, and a full release was executed. Afterwards they wrote the creditor, asking him to carry the securities until they could fulfill their obligation to take them back, which they hoped would be within the year. *Held,* in view of the second letter, the proposition for a compromise made in the first letter amounted

to a moral obligation to take the securities back at 80 per cent. sufficient to support subsequent promises to do so.

**2. SAME—SUBSEQUENT PROMISES TO PAY.**

Where, in an action against the members of a firm, which, in getting plaintiff to accept a compromise of a claim, had morally obligated itself to take back at a named date certain securities at a valuation of 80 per cent., it was shown that just before this date defendants had written plaintiff to hold the securities till they could fulfill such obligation, which they hoped would be within a year; that a member of the firm had told him that he expected to take the securities "within a little time," "within a few months;" and again, "I am going to pay; business is getting better;" and that the plaintiff did not demand payment for the securities till four years afterwards—the trial judge was warranted in finding a definite promise to take the securities within the time allowed by plaintiff.

**3. SAME—ABILITY TO PAY.**

Where, in an action against the members of a firm on a debt for which the promise to pay was supported by a moral obligation, it was shown that the firm had a seat on the stock exchange, worth more than enough to satisfy the debt, the trial judge was warranted in finding that the firm was able to pay.

**4. ASSIGNMENT—EFFECT AS TO COPARTNERS.**

A firm which had made a general assignment issued a letter to its creditors with a proposition to adjust all claims against it, so that it could resume its business. This it afterwards did, and continued the business in all respects the same as before, under the same name, and with the same copartners. The various instruments adjusting claims after the assignment were executed by various members of the firm, and recited that "the said firm was desirous of resuming business," etc. *Held*, that this amounted to a resumption and continuance of the original copartnership, sufficient to make binding on the firm promises of the firm's members to pay in full compromised debts, such promises being supported by a moral obligation to pay.

Appeal from Trial Term, Cayuga County.

Action by George M. Taylor against Horace L. Hotchkiss and Allen F. Hedges, as surviving partners of Harvey B. Rich, of the firm of Horace L. Hotchkiss & Co. Judgment for plaintiff, and defendants appeal. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, WILLIAMS, HISCOCK, and NASH, JJ.

Frederick E. Storke, for appellants.

John D. Teller, for respondent.

HISCOCK, J. We think the judgment appealed from should be affirmed.

This action was brought upon two causes of action, set forth in the complaint. As his first cause of action plaintiff alleges, in substance, a claim that the defendants and Rich, as copartners, in the years 1894 and 1895, became obligated to take from the plaintiff certain shares of stock at a certain price, which they failed to do, causing him damages in the sum of $2,900. His second cause of action is upon an alleged account stated between him and said copartners, upon which there was at the time of the commencement of the action an unpaid balance of $2,900, with interest.

The material facts upon which the plaintiff seeks to recover are as follows:

Prior to June, 1894, the firm of Horace L. Hotchkiss & Co., composed of the defendants and Rich, who is dead, had been engaged in carrying on a stockbrokerage business in the city of New York, and had become indebted to plaintiff, as one of their customers, in the sum of $5,740. Some time prior to said date the firm had become embarrassed, and unable to pay its debts, and had made a general assignment. Early in 1894, and after said assignment was made, it had sent a circular letter to plaintiff and its other customers, which offered a plan of adjustment of its debts, so that said firm could resume business upon the stock exchange. The important provisions of this proposition, so far as immediate payment of anything to its creditors was concerned, was that the latter should take in pro rata amounts a certain number of shares of the capital stock of the American District Telegraph Company and certain railroad bonds at a valuation of 80 per cent. of the par value of said securities in liquidation of the firm's indebtedness, and should therefor compromise their debts and release said firm. Said letter contained certain other provisions material in this case, to which we shall refer hereafter. Plaintiff hesitated to accept this proposition, but finally, after he had received about $1,100 in other securities, did, in common with the other creditors of said firm, in consideration of the delivery to him of 58 shares of the stock of the American District Telegraph Company, compromise with said firm, and under seal executed what is conceded to have been a full and complete release of the same and of its various members from and on account of the indebtedness due to him. Said release was dated September 19, 1894. No question is made upon this appeal but that said release, standing by itself, would effectually bar plaintiff from thereafter making any legal claim against said firm, or any of the members thereof, on account of the indebtedness theretofore due from them to him. It is claimed, however, that in connection with said compromise and settlement said firm incurred moral obligations to thereafter retake from plaintiff the securities which he had received at the same value at which he had taken them, and which value was necessary to completely pay his indebtedness; and that subsequently, and after said compromise had been perfected, said firm made express promises to so retake said securities which find such a consideration in the moral obligation referred to that they can be enforced in this action. It was upon this theory that the learned trial justice allowed a recovery in the case, and we now pass to a consideration of the facts which especially bear upon this branch of it.

The letter hereinbefore mentioned, in addition to the propositⁱᵒns of settlement therein set forth already referred to, contained these clauses:

"We propose to offer our moral obligation to take these securities back from our creditors at 80% at a date not later than April 1, 1895. [Reference being thereby made to the securities which were to be delivered to the firm's creditors in adjustment of their indebtedness.] * * * In addition to our moral obligation to take back the securities at 80% on or before, if possible, April 1, 1895, we can secure the written obligation of Mr. J. D. Williamson," etc. "You will ask me how we propose to take care of our moral obligation to take back these securities April 1, 1895. We reply as follows: We propose to fortify our moral obligation by devoting every

effort to collect from debtors what is possible from our estate. Besides the above, the writer has a large personal interest in the Nicaragua Canal enterprise, which at present could not be sold for $2,000. The company is now in process of reorganization. * * * If this enterprise can be saved from bankruptcy, this asset may have some value in the future, and thus aid us to that extent to fortify our moral obligation. * * * Your approval and acceptance of this plan will do much in aiding us to carry out this settlement."

As already stated, plaintiff did eventually approve of and accept the plan, and executed a release in accordance therewith. Having adjusted its affairs with its various creditors, said firm resumed and continued its business for some time, the copartner Rich not dying until March, 1898. After the compromise had been executed, and on or about March 27, 1895, said firm wrote plaintiff as follows:

"We are obliged to ask you to carry the 58 shares of American District Telegraph stock * * * until we are able to fulfill our moral obligation to you to take the stock off your hands at 80%. * * * We trust that within the coming year that such a fulfillment of our intentions may be consummated."

In the spring of 1895 plaintiff had a conversation with the defendant Hotchkiss, in which the latter asked plaintiff to be lenient, and said that he proposed to pay. "He said that he would pay as soon as he could, and take the stock at $80 a share. He said he hoped to pay within the time specified that we agreed upon." Plaintiff saw said defendant again in the fall of 1895, when he said "he expected to take that stock at $80 a share within a little time; * * * within a few months." And still again said defendant said to plaintiff: "I want you to be easy. I am going to pay. Business is getting better." In November, 1899, plaintiff made a formal tender of his stock to the defendants, and they refused to accept and pay for the same. It appears that the market value of the stock at the time of the tender was $30 a share. The defendants, or the defendant Hotchkiss individually, at the time of the trial, owned a seat in the stock exchange, which was saved by the settlement with creditors, and which, from being worth $30,000 at said time, had become of the value of about $70,000.

There was no dispute upon the trial as to the facts. Although one or both of the defendants were present thereon, no evidence was offered on their behalf, and at the conclusion of the evidence it was agreed by both sides that the disposition of the case should be directed by the trial justice, the submission of no questions of fact to the jury being urged or asked in behalf of the defendants.

As indicated by his memorandum opinion, the trial justice took the view that what took place between the defendants and plaintiff subsequent to the compromise amounted to an agreement by the former to take from the latter the securities which he had accepted in settlement at 80 per cent. of their value when they were able so to do; that said promise found a sufficient consideration in the moral obligation assumed in the proposition for a compromise made by defendants; and that at or before the time when tender of the stock and demand was made defendants were in position to comply with their agreement. It is not entirely clear, either upon the face of the complaint or from

his attitude upon the trial, whether the learned counsel for the plaintiff proceeded upon the theory that the original letter referred to contained a legal binding obligation to take back plaintiff's securities at a fixed valuation, and that the conversations between him and the defendants subsequent to the execution of the release operated as a waiver of the bar which the latter otherwise would have been to the enforcement of the original promise, or whether he proceeded upon the theory that what was said in the letter created a mere moral obligation which furnished a consideration for the promise made after the release, and which constituted the real and definite agreement upon which the recovery must rest. We think, however, that his complaint so includes both theories, and that all of the facts were so presented as to allow a recovery to stand, if at all, upon the latter basis, which we regard as the tenable one. While, as a mere rule of pleading, the courts have allowed cases of this character to proceed upon the former theory, this has seemed to be done as a matter of permission and tolerance, and with full recognition of the fact that it was more logical to treat the subsequent promise as the cause of action, and the original obligation reduced from a legal to a moral character as merely supplying the consideration. Depuy v. Swart, 3 Wend. 136, 20 Am. Dec. 673; Dusenbury v. Hoyt, 53 N. Y. 521, 13 Am. Rep. 543; Scheper v. Briggs, 28 App. Div. 115, 50 N. Y. Supp. 869. Moreover, in this case we do not think that, as alleged in the complaint, any legal obligation to retake the securities was incurred at or before the making of the compromise agreement. The engagement then undertaken in this respect was expressly stripped of any legal binding force by the language used.

Neither do we think that material error was committed, or any substantial injury caused to defendants, by the refusal of the court upon the trial to cause plaintiff to make an election between the causes of action set forth in his complaint. At the time the motion was made the course of the trial had indicated very plainly upon which one a recovery must be had if at all. Tuthill et al. v. Skidmore et al., 124 N. Y. 148, 26 N. E. 348.

In a preliminary way it is urged by the learned counsel for the appellants that the letter issued by defendants' firm, and upon which this action must ultimately rest, did not contain any then present actual engagements or promises of even a moral character, but was simply a tentative proposition of what the defendants would do in the future if their creditors viewed with favor the proposition. We do not, however, coincide with this view. While the words, "We propose to offer our moral obligation to take these securities back from our creditors at 80% at a date not later than April 1, 1895," would, standing by themselves, upon casual inspection, seem to sustain the defendants' theory, we think the entire letter, considered in all its parts, is a distinct, definite, present proposition submitted to the creditors, and that this is fully indicated by the closing sentence, "Your approval and acceptance of this plan will do much in aiding us to carry out this settlement."

No defense under the statute of frauds to defendants' agreement was interposed by their answer, or urged upon the argument of this appeal.

Therefore, passing by these preliminary propositions, we come to the consideration upon the merits of the interesting question whether a moral obligation from defendants to plaintiff did survive the execution of the compromise agreement, which would furnish a legal consideration for a promise and agreement by the defendants to retake these securities, and whether such promise and agreement, definite and distinct enough to be enforced, was made. We understand it to be conceded by the appellants that if plaintiff, under proceedings in bankruptcy or in other involuntary form, had been compelled to accept the stock received by him in full legal settlement of an indebtedness which it did not in fact actually pay, a moral obligation upon the part of the debtor to pay the deficiency would have survived his discharge from his legal and enforceable obligations, which would be a sufficient consideration for a subsequent promise to pay such balance. Upon the other hand, we understand that it is conceded by the respondent that, if plaintiff, without further agreement or provision by voluntary proceedings of compromise had accepted the stock in question in full settlement and satisfaction of the indebtedness due to him, no moral obligation upon the part of the debtor would have survived which would have furnished an adequate consideration for a subsequent promise to pay. At least, whether conceded or not, these propositions seem to be established beyond any question. Dusenbury v. Hoyt, supra; Stafford v. Bacon, 1 Hill, 532, 37 Am. Dec. 366; Ainsworth v. Powell, 8 Wkly. Dig. 333; Matter of Merriman's Estate, 44 Conn. 587, Fed. Cas. No. 9,479.

Conceding this latter rule, however, it is urged on behalf of the plaintiff that the debtors in a voluntary compromise may, by their acts, expressly provide for that survival of the moral obligation in the future to pay in full the indebtedness compromised, which, by rule of law, would remain in the case of the discharge of a debtor by process involuntary as against his creditors, and that this is what has been done in the case; that defendants' firm expressly assumed an obligation resting upon their conscience, and intended to survive and take effect after their legal discharge, to make good any balance of their debts remaining actually unpaid by the surrender of their securities. We think that this contention is well founded. Under the wide power which parties have to form and fashion their agreements as they deem best, we think that the firm of Hotchkiss & Co., as an inducement to their creditors to make a voluntary compromise, did bind themselves in honor, if they were able so to do, to satisfy in full the claims against them, even after they had been discharged from legal obligation so to do. The promise to retake the securities turned out to their creditors at the price at which they were accepted amounted, in substance, to a promise to make full payment. If the securities were taken back at the price fixed, their value at that price would be sufficient substantially to pay the debts in full. We think this was the purport of what said firm promised in their original circular letter referring to moral obligations, especially constructed in the light of the letter issued after the compromise had been effected referring to their inability thus far to fulfill such moral obligation. Their creditors accepted in compromise certain securities at a fixed price, and at which ·price said

securities paid the debts in full. It is apparent, however, that at the time the parties regarded the valuation as an arbitrary one, and one which did not by any means represent the market value thereof. Subsequent events showed that it very largely exceeded the actual value of the securities, at least in the case of the stock which plaintiff took. Realizing or anticipating this, the debtors said to their creditors, in substance, that if they would take these securities at the arbitrary price which furnished payment in full, they, the debtors, as a matter of conscience and honor, would thereafter, if able, protect the creditors against any deficiency, and secure payment in full of the debts, by retaking said securities at the price fixed. To our mind, what was said and done upon this subject operated to preserve by actual promise the same moral obligation to protect creditors which would have survived under a rule of law if the discharge had been by force of law, rather than by voluntary proceedings. We think that the moral obligation assumed by the debtors, having the purpose suggested to secure payment in full of a prior indebtedness, may be regarded as being so connected with and relating to a prior legal obligation as to bring it within the characteristics of moral obligations which are held sufficient to furnish a legal consideration for subsequent promises or agreements. It has been held that a mere obligation of morals or conscience, entirely disconnected with and having no origin in any legal or equitable obligation, would not be sufficient to operate even as a consideration for a promise or agreement. That, however, is not this case. Goulding v. Davidson, 26 N. Y. 604, 610; Ehle v. Judson, 24 Wend. 97.

We do not think that defendants' contention is well founded that any such obligation as we have discussed was either in contradiction of the written agreement between the parties as evidenced by the instrument of compromise, or that it was canceled and discharged by such agreement. The rules which they invoke in this respect clearly and manifestly relate to legal and enforceable obligations. Undoubtedly, the agreement of compromise which the plaintiff executed absolutely discharged and exonerated defendants from any legal liability in respect to the indebtedness which they had theretofore owed. But we think this was its extent and limit so far as the questions involved in this case are concerned. The promise to retake securities delivered to their creditors was manifestly intended to take effect after their discharge. In our view, it was not a legally binding promise. If nothing more had been done in respect to it, it could not have been enforced. It simply furnished a consideration for a promise and agreement made after defendants had been discharged by their compromise, and for that purpose and to that extent we think it was not destroyed by such compromise. There seems to be no question but that in the case of a discharge of a debtor from his legal obligations by proceedings which are involuntarily as against his creditors a moral obligation to pay his debts in full survives. This case is similar to that.

The remaining query in this connection is whether that which was said by the defendants was a sufficient promise and agreement, based upon the moral obligation to take plaintiff's securities, to sustain this action. Under the course adopted by the parties in requesting the trial justice to dispose of this case without submission to the jury, it

is our duty to assume in support of his disposition any facts which he was entitled to find upon the evidence. We think that he was so entitled to find from the defendants' letters of March 27, 1895, and from the conversations had by the plaintiff with the defendant Hotchkiss, and to which already reference has been made, that the defendants, in 1895, promised that they would retake the stock in question at $80 a share as soon as they could, and that business was improving, and that they would be able to do this "within a little time," "within a few months"; also that the time of plaintiff's tender and demand in 1899 allowed a reasonable and sufficient time for compliance; also that with an ownership of a seat in the stock exchange worth $70,000 defendants were able to comply with the agreement. We·think it was permissible for the trial justice to thus deduce from the evidence conclusions of a definite promise to do a definite thing within the time allowed by plaintiff, and the ability to perform this agreement. In answer to the suggestion made in behalf of appellants that there was not sufficient evidence of ability to pay, because the value of the seat in the stock exchange would not be sufficient to pay all debts which had been of a character similar to plaintiff's, it may be said that there was no such evidence of the present existence of those debts as would support this contention. The liability would not rest upon defendants to pay such other indebtedness, unless by reason of some new obligation incurred after the compromise proceedings. It does not appear that any such new obligation has been incurred to the other creditors.

Lastly, in support of this appeal it is urged somewhat briefly and incidentally that the firm of Hotchkiss & Co. was dissolved by their assignment, and that thereafter one of the members of said copartnership would not be authorized to bind the latter or his associates by any promise or agreement to pay plaintiff's indebtedness. While the insolvency and general assignment of a copartnership would ordinarily and technically operate as a dissolution thereof, we think that upon the facts appearing in this case the copartnership of defendants existing in 1895 must be regarded as having been a resumption and continuance of the original copartnership, rather than a new one. The original circular letter for the settlement of claims issued after the general assignment distinctly looked to so adjusting claims against the firm that it could resume and continue its business. After the adjustment it did resume and continue its business in all respects the same as before. The firm name and the copartners were precisely the same. The various instruments adjusting debts executed after the assignments were executed.by the various defendants as members of said firm, and recited that "the said firm of Horace L. Hotchkiss & Co. was desirous of resuming business as bankers and brokers," etc. The indebtedness which was the basis of all negotiations and agreements with plaintiff was a firm indebtedness, and the moral obligation which was preserved over and beyond the settlement of legal obligations was of a copartnership, rather than an individual, nature. The recognition of this moral obligation upon which plaintiff's cause of action is based is found not only in conversations had by him with the defendant Hotchkiss, but also in the letter of March

27, 1895, which was written by the defendant Hedges in the firm name. Under all of these circumstances, it seems to us that it was permissible for the trial justice to find that the copartnership in existence in 1895 was, for the purposes of this action, a continuation of the old one, rather than a new one, formed after the assignment; that any obligations to plaintiff in respect to this prior indebtedness rested upon the firm and the various members thereof; that the letter of the defendant Hedges and the conversations of the defendant Hotchkiss indicate a common purpose of the copartners to recognize, adjust, and fulfill the engagements of the copartnership, and that each of the defendants is bound by what was said and done by the other in carrying out this object. We think the judgment should be affirmed, with costs.

Judgment and order affirmed, with costs. All concur.