[File No. 6997]

WILLISTON SAVINGS AND LOAN ASSOCIATION, a Corporation, Appellant, v. DAISY M. KELLAR and Joseph T. Kellar, Respondents.

(22 NW2d 30)

Opinion filed February 28, 1946

*Eugene A. Burdick,* for appellant.

*Walter O. Burk,* for respondent.

Burr, J. There is no factual dispute in this case and we outline events chronologically.

It is stipulated: that the defendants had been the owners of a home in Williston; they were in debt to the plaintiff and mortgaged the real property to secure the indebtedness; on July 5, 1932 the mortgage was foreclosed and the property bought in by the plaintiff for $1536.03; the defendants did not redeem; on July 5, 1933 the plaintiff received a sheriff's deed to the property, incurring further expenses in the sum of $4.00; but the plaintiff permitted the defendants to remain on the premises from that time on without payment of rent.

It is further stipulated, "That thereafter, on or about the 24th

day of October, 1933, the Defendants applied to the Home Owners' Loan Corporation, North Dakota Agency, Minot, North Dakota, for the refunding of the indebtedness against his home. . . ."

On October 24, 1933 the Home Owners' Loan Corporation, hereafter known as the "Loan Corporation" wrote to the plaintiff Ex. 1 soliciting information as to whether the defendants kept up their payments, the status of plaintiff's claim and "a detailed statement of the borrower's indebtedness to you with interest rate."

The plaintiff replied on October 27, with this Ex. 2:

"Referring to your letter of October 24 concerning application No. 59, Daisy M. Kellar, Williston, N. Dak., we answer as follows:

In this case we foreclosed our mortgage and obtained a sheriff's certificate for $1,536.03 under date of July 5, 1932. We are not willing to continue financing in this case, and have consented to take bonds. The amount due us is as follows:

Principal sum of sheriff's certificate ..........$1,536.03
Interest at 8% to October 31, 1933 ............  172.44
We paid for sheriff's deed and revenue stamps ..    4.00
                                                   _____
Total due us to October 31, 1933 .............$1,712.47

In addition to this he owes a small bill for insurance, $11.70 and the interest figures 34 cents per day, which should be added at that rate from November 1, 1933 to date of settlement."

On November 18, the Loan Corporation wrote to plaintiff Ex. 3, stating:

"We have a letter from Jos. L. Kellar, husband of the above-named applicant, in which he states that it is impossible for him to take care of the expenses in connection with the closing of the loan. These expenses are made up of the abstracting and recording fees, appraisal fees, fee for examination of title and insurance premiums. Exclusive of the insurance premiums, the expenses will amount to about $30.00. We have written to Mr. Kellar and asked him to take care of at least the

abstracting and recording fees, which we have estimated at about $12.00. Would it be possible for you to add the balance of these expenses to the amount due you on your mortgage and *advance them so that the loan can be closed?* (Italics ours.)

Will you please advise us regarding this and also advise how much insurance you hold in connection with this loan together with expiration dates?"

On November 20, plaintiff answered with Ex. 4:

"Your letter of the 18th is received with reference to application No. 59, Daisy M. Kellar, Williston, N. Dak., and asking us to advance some $70 or $80 expenses in connection with this loan, and accepting H. O. L. Corporation bonds for the same.

We will have a directors' meeting tomorrow evening at which I will take this up, although I do not think that it would be good business for us to act on your suggestion. We have already agreed to accept bonds *for our claim.* (Italics ours.) We have a sheriff's deed to the property, and on the strength of a loan being in contemplation we have allowed these people to live in the house since the first of July, nearly five months now, when we should have been receiving rent of at least $20 or $25 a month. By accepting bonds at this time we are virtually taking a discount of over 15% of our claim, in case we cash the bonds now. It amounts to that anyway, whether we cash them or not, for if we had the cash we could buy bonds at that rate.

We do not expect the impossible, and do not want to appear as being unreasonable, but it does seem that when we are allowing these deals to run as we have, in anticipation of loans being made so that they can save their homes, that we should have a little consideration given our side of the proposition. We are not padding our claims, and could actually figure even more interest than we are in nearly every case, and I do not believe that we should be asked to advance cash in any deal in exchange for bonds at a direct loss to us of over 15%.

Please reconsider this matter and try to plan it so that the loan can be closed at once *without any further loss to us."* (Italics ours.)

On February 13, 1934 the Corporation wrote Ex. 5:

"We acknowledge receipt of money order for $21.00, insurance policy, Mortgagee's Statement and Bond Consent, which were enclosed in your letter of February 7.

We are herewith enclosing new bond consent in the amount of $1725.05, *as this is the largest amount we can allow* in this application." (Italics ours.)

And on February 15, 1934 the plaintiff replied: (Ex. 6)

"We have your letter of the 13th with new bond consent and have taken the matter up with Mr. Kellar. The amount of our claim was figured to March 31, which with the insurance amounted to $1,800.38. We have not yet paid for the insurance, but have refigured the deal now to Feb. 28th, $1,742.44, with the insurance $1,789.29. We enclose new tax statements amounting to $277.65.

We are wondering if we pay these taxes if the loan can then be made large enough to cover our claim in full. *We have talked with Kellar about it and he has agreed to let us have a second mortgage for the balance, but if the deal can be closed up in full* we would rather pay the taxes and handle it that way." (Italics ours).

"The deal" was not "closed up in full," as shown by Ex. 5 and Ex. 7. Plaintiff executed and delivered this "Mortgagee's Consent to take Bonds," (Ex. 11).

To Home Owners' Loan Corporation:

"The undersigned is the holder of a first mortgage or other obligation, which constitutes a lien or claim on the title to the home property of Daisy M. Kellar located at 513 Sixth Avenue West, Williston, North Dakota, in the sum of $1800.38.

Being informed that said owner has made application to Home Owners' Loan Corporation to refund his said indebtedness, the undersigned has considered the method of refunding mortgages provided in Home Owners' Loan Act of 1933, as passed by Congress and approved by the President, and the undersigned hereby consents, if said refunding can be consummated, to accept in full settlement of the claim of the undersigned the sum of $1725.05, face value of the bonds of Home

Owners' Loan Corporation, to be adjusted with not exceeding $25 cash as provided in said act, and thereupon to release all the claim of the undersigned against said property.

It is understood that you will incur trouble and expense in connection with your effort to refund the indebtedness of said home owner, and this consent is executed in consideration of the same and shall be binding for a period of ninety days from date.

This, the 13 day of February, 1934."

On February 21, 1934 the Corporation wrote: (Ex. 7)'

"We have your letter of February 15 and refer to our letter of February 13 regarding the maximum amount of this application.

Upon receipt of the bond consent as outlined in that letter we feel that we shall be able to proceed with this application."

On February 24, 1934 the plaintiff responded with Ex. 8:

"Enclosed we hand you sheriff's deed to us dated August 5th, 1933, also special warranty deed to Daisy M. Kellar and a satisfaction of the mechanic's lien from Grogan-Robinson Lumber Company. These papers to be held in escrow pending completion of the loan."

In addition to the exhibits set forth it is agreed that the original indebtedness owed by the defendants to the plaintiff drew interest at the rate of 8%, that the mortgage to the Loan Corporation was executed on March 24, 1934 and recorded April 1, 1934, and "that the loan for which the Defendants had made application was officially closed by the Home Owners' Loan Corporation on the 11th day of April 1934."

On April 7, 1934 the defendants executed and delivered to the plaintiff the promissory note and second mortgage in issue, the mortgage being recorded April 21, 1934. It is stipulated:

"That the indebtedness represented by said Promissory Note and Mortgage, Exhibits 9 and 10, consisted of insurance premiums in the sum of Forty-six and 85/100 Dollars ($46.85), paid by the Plaintiff to Williston Insurance Agency, which said insurance premiums represented insurance on said real property for policies issued during the years 1932, 1933 and 1934,

and the further sum of Seventeen and 39/100 Dollars ($17.39), *which said sum represented the difference between the amount of the loan and bond consent in the sum of Seventeen Hundred Twenty-five and 05/100 Dollars ($1725.05), as appears from the Plaintiff's Exhibit 5 and the 'indebtedness' of the Defendants owed to the Plaintiff* in the sum of Seventeen Hundred Forty-two and 44/100 Dollars ($1742.44), as shown by Plaintiff's Exhibit 6, which said sums aggregate Sixty-four and 24/100 Dollars ($64.24), and that in addition there was a seventy-five cents (75¢) recording fee for said real estate Mortgage, which made an aggregate indebtedness evidenced by said Note and Mortgage in the sum of Sixty-four and 99/100 Dollars ($64.99), and that in the execution of said Note and Mortgage, the amount was inserted in the sum of Sixty-five Dollars ($65.00) exactly."

Defendants failed to pay any part of the principal and interest on this note and this action was commenced to foreclose the mortgage.

Defendants' answer alleges: that the attempt to refinance the original indebtedness was made at the solicitation of the plaintiff and that,

"The Plaintiff herein entered into a mortgagee's consent to take bonds in which the Plaintiff herein agreed to accept the sum of Seventeen Hundred Twenty-five and 05/100 of the bonds of the Home Owners Loan Corporation to be adjusted with not exceeding Twenty-five Dollars cash in full payment of the Satisfaction of said mortgage and any and all claims which the plaintiff had against these defendants; . . ."

Further that the Corporation delivered to the plaintiff the full amount of bonds agreed upon, but,

"That in violation of the terms and conditions of said consent to take bonds, and despite the fact that the indebtedness these defendants owed to the Plaintiff had been fully compromised and settled, the Plaintiff by and through its manager, N. B. Ludowese, procured the signatures of these defendants to the mortgage which the Plaintiff seeks to foreclose in this action;

"that said note and mortgage was given without any consideration whatsoever and that said mortgage is wholly void and against public policy and is in violation of the Home Owners' Loan Act of 1933 and the rules and regulations of the Board of Directors of the Home Owners Loan Corporation which were put into effect, pursuant to said Act."

Upon the stipulated facts and the exhibits in this case the trial court found there was no consideration for the note and mortgage involved and,

". . . that there is no evidence in the record showing that the Home Owners' Loan Corporation knew of the existence of said mortgage at the time it was executed; that there was no consideration for said mortgage and that said mortgage is wholly void because of an utter failure of consideration and because said mortgage is against public policy."

The court thereupon concluded as a matter of law that said mortgage should be cancelled and plaintiff's action dismissed. Judgment was entered accordingly and the plaintiff appeals.

It may be true that the Loan Corporation did not know of the existence of this mortgage "at the time it was executed" as found by the trial court. It was not executed until after the Corporation's mortgage was recorded. However that is immaterial. It knew that there was this agreement for a second mortgage if the deal could not be closed in full.

There is no proof whatever that the movement to refinance the indebtedness of the defendants was made at the solicitation of the plaintiff. The stipulation of facts states,

"on or about the 24th day of October, 1933, the Defendants applied to the Home Owners' Loan Corporation . . . for the refunding of the indebtedness against his home, following which application the said Home Owners' Loan Corporation, in due course, transmitted to the Plaintiff a form letter, . . ." (Ex. 1.)

Clearly, when the defendants found the Loan Corporation would not deliver bonds to the plaintiff in the full amount of the plaintiff's claim, and as an inducement to the plaintiff to accept the amount of the bonds which the Loan Corporation

would deliver, the defendants promised and agreed to give a note and second mortgage for the difference. Thus, before the plaintiff's debt could be said to have been extinguished in whole or in part by any acceptance of bonds, the defendants agreed to give a note and mortgage for a part of a pre-existing debt.

The property belonged to the plaintiff in July 1933, but the plaintiff permitted the defendants to remain on the premises without any rent all the time from July 1933 until April 1934.

The record is silent as to any negotiations between the parties to this action after the foreclosure and prior to the application made by the defendants to the Loan Corporation. There is nothing to indicate but what the entire debt which the defendants owed the plaintiff was wiped out by the foreclosure. The record shows the plaintiff bid in the property at foreclosure sale for $1536.03, and we are justified in assuming the plaintiff bid it in for the full amount of the debt. There is nothing in the record to show the contrary. Consequently whatever were the subsequent negotiations between the parties the effect was the defendants were buying the home from the plaintiff, as the sheriff's deed extinguished all their rights to the premises. The plaintiff was willing to sell the property to the defendants for the amount of its claim, figured by it to be $1,800.38, having computed the interest at 8% in accordance with what the original debt drew. We have a right to assume this was to be a cash deal between the plaintiff and the defendants. Ex. 4 shows that at the time it was mailed to the Loan Corporation the Loan Corporation had stated it would deliver bonds but the record of that time does not show the amount of these bonds. Whatever was the amount, the plaintiff stated there would be a direct loss to it of over 15% and this was countered by a subsequent statement on the part of the Loan Corporation that it would deliver bonds in the sum of $1725.05 and no more. The record shows this agreement between the parties to this action—the plaintiff was to accept, as part payment of its claim or of the purchase price, the amount of bonds that would be delivered and the defendants would give a note and mortgage for the difference. The plaintiff so notified the Loan Corpora-

tion and accepted bonds. The face value of these bonds was applied upon the purchase price or the claim and the defendants executed a note and second mortgage for the difference.

We can read through the transaction an understanding between the parties to this action whereby the defendants could recover their home; either by re-purchase for the exact amount which the plaintiff had invested in the property, or an understanding that the sheriff's deed was taken more for security than for any other purpose so that the defendants still had some redemptive interest in the land. The method is immaterial. Apparently all the plaintiff wanted was the amount due it under the terms of the mortgage that was foreclosed and the cost and expense thereafter incurred; and thus the plaintiff was willing to assist the defendants in the recovery of the home.

The stipulation is silent as to what was the agreement between the plaintiff and the defendants with reference to the insurance; but as the property involved was city property and the home of the defendants, the conclusion is practically irresistible that the defendants had agreed to keep the buildings insured and that the plaintiff was compelled to take out insurance policies as protection.

The exhibits show that, in addition to the amount due the plaintiff when it received its sheriff's deed, there were taxes against the property amounting to $277.65 (Ex. 6). There is no stipulation as to who paid these taxes; but the exhibits show the amount of the taxes was not included in the statement of debt furnished by creditor. From Ex. 5 we learn that in addition to the amount due the plaintiff on the original debt it advanced $21 for some item.

The defendants make no attack upon Ex. 6 wherein it is stated that a second mortgage was to be given for whatever amount would be due the plaintiff, after deducting the face value of the bonds received. The answer is practically "confession and avoidance." Ex. 4 shows a consent to take bonds for the entire debt, but the plaintiff did not receive bonds in full amount of its debt. The Corporation, by Ex. 5 definitely refused to

issue bonds in excess of $1725.05. This is reiterated in its letter of February 21 (Ex. 7).

From the stipulation of facts we learn that the plaintiff obligated himself to pay the insurance premiums for the years 1932–1934 inclusive which amounted to $46.85. This was after the foreclosure and not a part of the debt originally stated, though afterwards included in the $1800.38. The defendants were unable to pay the recording fees, abstract fees and expenses for examining title, etc., and therefore we conclude this amount would be deducted from the amount of debt refunded. From Ex. 3 we learn that these extra expenses were in the neighborhood of $30.

The defendants assert the taking of this note for $65 was a violation of the consent agreement set forth in Ex. 11. If this instrument were the only instrument bearing on the subject, defendants' assertion that nothing further growing out of the claim could be charged to them and therefore there was no consideration for the note, would have basis in fact. But Ex. 11 must be taken in connection with the other exhibits admitted by the defendants to be true. The local office of the Loan Corporation was in Minot and the homes of the parties to this action were in Williston. According to the record the transactions were carried on by mail. The Loan Corporation had no true conception of the status of the situation at first. Ex. 1 is based on the theory that the mortgage had not been foreclosed.

Plaintiff was merely wanting to get for the property the amount of its original indebtedness with interest and expenses. It could not do this. To get something tangible it was willing to take bonds for the major portion of the debt, subordinate the remainder due, and relegate itself to second place because of the defendants' agreement to execute the second mortgage.

There was no secrecy about this agreement. Before the Loan Corporation came to a definite understanding with the plaintiff as to the amount of bonds the plaintiff would accept, it knew approximately what deficit there would be and that the defendants had agreed to give a second mortgage for this. It made no objection, thus tacitly approving the arrangement.

As the first mortgage was not recorded until April 1, the Loan Corporation would not deliver the bonds prior thereto and the amount stated in Ex. 6 would be increased by interest.

When we consider Ex. 5 dated February 13 and Ex. 6 of February 15, it appears that two instruments known as the "mortgagee's consent to take bonds" had been mailed and though Ex. 11 is dated the 13th of February it is clear from Ex. 7 a letter under date of February 21, that the bond consent which clinched the case had not then been delivered to the Loan Corporation. We assume from the records that it was of the same tenor as Ex. 11. There is nothing to indicate that Ex. 11 was at any time part of the files of the Loan Corporation.

When the plaintiff agreed to accept bonds for its indebtedness there were two matters made very clear to the Loan Corporation: that there was due the plaintiff the $1800.38 specified not including any further advancements, and that the defendants had agreed to execute a second mortgage to the plaintiff for any deficit. The stipulation as to the items in the note involved shows the consideration and a review of the facts shows the note could have been for a larger amount. Is plaintiff barred from recovery on this claim?

The facts require a consideration of the federal statute known as the "Home Owners' Loan Act" of 1933. This statute has been before State jurisdictions on numerous occasions and out of the variety of interpretations well defined principles have been developed.

We find three specific provisions of the Act which govern these State decisions generally. The first deals with the expressed and declared purposes of the Act, to-wit: "To provide emergency relief with respect to home mortgage indebtedness, to refinance home mortgages, to extend relief to the owners of homes occupied by them and who are unable to amortize their debt elsewhere, . . . ." (Title of the Act, June 13, 1933, 48 Stat. 128, c 64.)

The second is concerned with this provision in § 8(a), "whoever makes any statement, knowing it to be false . . . for the purpose of influencing in any way the action of the Home

Owners' Loan Corporation . . . shall be punished by a fine
. . . or imprisonment . . . or both."

The third deals with that portion of § 4(k) which provides
that the Board may "make such by-laws, rules and regulations,
not inconsistent with the provisions of this section, as may be
necessary for the proper conduct of the affairs of the Corpora-
tion."

The great majority of the cases we have examined consider
these to determine the public policy of the Act. It will be noted
that Congress did not declare in specific terms what this public
policy is. The public policy is deduced from the title of the Act
and some cases indicate that provision authorizing the Corpo-
ration to make "rules and regulations" not inconsistent with
the provisions in § 4(k) may be used as an aid to determine
public policy. In the dissenting opinion of Judge Beals in
Jones v. Curtiss, 20 Wash 2d 470, 147 P2d 912, this whole fea-
ture is discussed and while not Washington law nevertheless
it is interesting because of the contention that "the courts have
built up the so-called public policy relied upon . . . and have
. . . extended the rules and regulations promulgated by the
governing board of the. HOLC beyond any reasonable con-
struction thereof."

This public policy is considered in determining whether any
agreement between creditor and debtor as to security for any
balance due the creditor can be made, other than represented
by the bonds issued and accepted. Does the acceptance of these
bonds wipe out, in every case, all right to any remainder of the
indebtedness and render void any agreement made with refer-
ence thereto? May such an agreement be made at times, and,
if so, under what conditions?

With reference to the second provision under consideration
there seems to be practical unanimity to the effect that this pro-
vision, being penal in its nature, is to be construed as rendering
void any secret agreement between creditor and debtor which
would preserve to the creditor any portion of his debt specified
in the "Consent" over and above the face value of the bonds.
The purpose of the Act is primarily to aid the debtor, to sub-

stitute one creditor for another, if possible, so that all relations to the former creditor are discharged in an entirety so far as the debt is concerned. The Loan Corporation would not ordinarily enter into any such deal for substitution of creditors if there would be no benefit to the debtor, and the benefit to the debtor consists in reducing the amount of the debt if it can be done as well as giving him more favorable terms. It would be useless for the Loan Corporation to refinance the debtor if it was merely giving the creditor additional security. The purpose is not to put the creditor in a better position and the Loan Corporation had the sole right to determine whether it would enter into any deal or arrangement whatever. Hence any false statement made by the creditor, knowing it to be false, and for the purpose of having the Loan Corporation enter into a deal ostensibly to wipe out indebtedness to the creditor yet preserving part, would be a fraud upon the Loan Corporation. It would be an inducing cause for the Loan Corporation to deliver bonds. When the creditor states, "All my indebtedness is to be extinguished," and thus induces the Loan Corporation to act, then that which the creditor should have done will be considered as having been done. Hence there would be no consideration for any new debt or mortgage. Such provision of the act is also for the benefit of the Loan Corporation to aid it in determining whether it will assist the debtor.

The third provision under consideration is the one which has determinative effect in such cases as the one at bar.

There are at least three principles developed from the consideration of these provisions. First, the debtor owes a claim which in equity and good conscience he should pay and though the government may desire to aid the debtor the creditor can not be compelled to accept bonds in lieu of his debt. The plaintiff's agreement to accept bonds for his debt is purely optional on his part. Thorne v. Edwards, 147 Or 443, 34 P2d 640; McAllister v. Drapeau, 14 Cal2d 102, 92 P2d 911, 125 ALR 800 (reversing (Cal App) 85 P2d 523). The debtor and the creditor may make such agreement as they see fit.

A second is that the Loan Corporation can not be compelled

by either creditor or debtor to act. The Loan Corporation has the sole power of determining whether it will refinance the indebtedness and of course may lay down conditions governing the particular case. Thus the courts overwhelmingly hold: that where the Act and the regulations provide the creditor shall sign a written consent to accept a stated amount in bonds in full settlement of the entire indebtedness due the creditor; and the creditor executes such an agreement but at the same time has a secret agreement with his debtor to get a second lien upon the property for the difference between the face value of the bonds and the amount due on the debt; such secret agreement is against public policy, is a fraud upon the Loan Corporation, is without consideration for the note and second mortgage and will be set aside in a proper action. See Cook v. Donner, 145 Kan 674, 66 P2d 587, 110 ALR 244; Anderson v. Horst, 132 Pa Super Ct 140, 200 A 721; Jones v. Curtiss, 20 Wash2d 470, 147 P2d 912.

This is the theory underlying our decision in Federal Land Bank v. Koslofsky, 67 ND 322, 271 NW 907, cited and stressed by defendants. The principle in this Koslofsky case has been cited and approved in many cases.. It will be noted that the case came before us on a demurrer to the complaint and the complaint showed the creditor and the debtor involved therein had entered into a secret agreement, made fraudulently to induce the Federal Land Bank to refinance an indebtedness, and this fraudulent agreement was such as justified the court in enjoining the creditor from transferring or assigning the note and mortgage taken in violation of the statements made to the Land Bank and upon which the Land Bank relied.

A third principle and one which seems to have overwhelming support, is that where the Corporation refinances an indebtedness with full knowledge of the fact that the debtor has agreed to give a second mortgage on the same property to the creditor for an amount not exceeding the difference between the face value of the bonds received and the amount of the indebtedness owed to the creditor, such agreement between debtor and credi-

tor is not necessarily void, has sufficient consideration for the note, and constitutes no fraud upon the Loan Corporation. It may refuse to refinance if it sees fit, or it may proceed. In Dayton Mortg. & Invest. Co. v. Theis, 62 Ohio App 169, 23 NE2d 511, it is held that, "Where a mortgagee agrees to accept bonds of the Home Owners' Loan Corporation in part settlement of the mortgaged debt, and where full disclosures are made, and in the absence of fraud, secrecy, duress and collusion, the mortgagor may contract with the mortgagee to take care of the difference between the total amount due and the face value of the bonds, subject only to the limitations of the Home Owners' Loan Act, . . . ." The only limitation referred to is lack of knowledge on the part of the Corporation. (62 Ohio App 177, 23 NE2d 515.) Some courts however do not even attach such limitation and hold that it is immaterial whether the Loan Corporation had knowledge of this agreement so long as there was no fraud upon the Corporation.

This Ohio case cited sets forth that where the Corporation was not advised of this independent agreement then the second mortgage given would be void as against public policy. In McVicar v. Peters, 12 Wash2d 92, 120 P2d 485, the court shows that a deal made between vendor and the vendee or assignee to execute a lien on property second to that of a Loan Corporation is not void when such agreement was known to the Loan Corporation and the vendor was not guilty of fraud or deceit. It also holds that, "The knowledge which a local representative of the Home Owners' Loan Corporation acquires in connection with a home owners' loan is imputable to the corporation." In Jones v. Curtiss, 20 Wash2d 470, 147 P2d 912, supra, the Washington court distinguishes between cases where the Loan Corporation "had knowledge of agreement between parties for continued existence of unpaid balance of original debt and its security by a second mortgage" and cases where no such knowledge was shown, thus affirming the principle in the McVicar Case.

In Kivett v. Cardwell, 26 Tenn App 372, 175 SW2d 334, the Tennessee court gives a slightly broader interpretation. It fol-

lows the principle adopted in Ohio to the effect that where the Loan Corporation had knowledge of an agreement between creditor and debtor to execute a second mortgage to secure the payment of an amount not in excess of the difference between the face value of the bonds taken and the appraised value of the property, and of course not in excess of the amount due the creditor, such agreement is not void; though it would be void "where no disclosure thereof was made to HOLC or its agent." But to this rule the Tennessee court adds this feature that where the Loan Corporation had knowledge of such an agreement its consent to and approval of the agreement between debtor and creditor are to be inferred. The same principle is upheld in Meek v. Wilson, 283 Mich 679, 278 NW 731.

A Court of Appeals in Tennessee had before it a case similar to the one at bar and held:

"Secret liens second to mortgage liens of Home Owners' Loan Corporation are void and unenforceable, but second liens, taken by creditors with such corporation's full knowledge, are valid and enforceable. Home Owners' Loan Act of 1933, §§ 1 et seq, and § 4(k), 12 USCA §§ 1461 et seq, and § 1463(k) [4 FCA title 12, §§ 1461 et seq, and 1463k]." Certiorari was denied by the Tennessee Supreme Court. See Smith v. Redwine, 26 Tenn App 104, 168 SW2d 185.

In Washington the court places the burden of showing the knowledge of the Loan Corporation upon the holder of the second mortgage. Jones v. Curtiss, 20 Wash2d 470, 147 P2d 912, supra.

The date of the transactions is important because of changes made in the rules of the Loan Corporation and some of the decisions are affected by these changes. However it is very clear that the great weight of authority is to the effect that where there is no secret agreement between the creditor and the debtor as to a second mortgage and no fraud and deceit practiced upon the Loan Corporation, and the second mortgage is taken with the knowledge of the Loan Corporation and in an amount not exceeding the difference between the face value of the bonds accepted and the amount of the indebtedness due the creditor, the

"consent" given by the creditor must be interpreted in the light of the facts known to the Loan Corporation so that such a second mortgage is not against public policy, does not violate any state or federal statute, is based upon a sufficient consideration and will be enforced.

The decision in Anderson v. Horst, 132 Pa Super Ct 140, 200 A 721, supra, sets forth clearly the distinction between secret and non-secret agreements. It states, "an agreement between mortgagee and home owner made without approval of Home Owners' Loan Corporation by which owner assumes or agrees to pay all or any part of mortgaged debt which has been settled and released by the refunding effected by the corporation is void as against public policy and can not be enforced by the mortgagee."

However in Walker v. Oakley, 347 Pa 405, 32 A2d 563, it is shown that while the object of the act was not to improve the mortgagee's security, and therefore a second mortgage taken by him was not "a matter of right but of privilege to be granted by HOLC" yet, "where mortgagee informed Home Owners' Loan Corporation, refinancing mortgage indebtedness, that reduction was to be covered by a second mortgage and HOLC with knowledge of such facts, refunded the mortgage and issued its bonds, second mortgage was valid as to amount approved by HOLC."

In the case cited the amount approved by HOLC was the amount stated by the creditor to be the amount to be secured by the second mortgage. There is this distinction between the two Pennsylvania cases. The former was a transaction which arose in 1933, under Chap 6, § 4-D(1) of the rules and regulations of the Loan Corporation adopted under authority of § 4(k) of the Act. That section provided that the Loan Corporation did not refund any indebtedness where the mortgagor was required to absorb any loss, and there was no proof that the Corporation had waived that ruling, or with full knowledge of the agreement had delivered bonds. The second Pennsylvania case refers to and distinguishes the Anderson v. Horst case and points out that in this latter case, "the agreement between the mortgagee

and the home owner was made without the approval of Home Owners' Loan Corporation . . . ." Therefore that agreement was held to be void as against public policy. In the note attached to 347 Pa 407, 32 A2d 564, a long list of decisions is appended showing the distinction between cases where the Loan Corporation had knowledge of the intended second mortgage and cases where the agreement was kept secret from it.

This Walker v. Oakley case (Pa) supra, cites and affirms Keystone Bank v. Booth, 334 Pa 545, 6 A2d 417, and quotes:

"It has been held that the validity of such agreements to remain bound is largely dependent on the presence or absence of a prohibition in the regulations adopted by the corporation. . . . Matters to be considered are the absence of collusion or concealment of the obligation from the authorized officials of the government agency, and their consent to the mortgagor's continued obligation for the balance."

In fact it is held at times that under the regulations of the Loan Corporation, provision was made whereby in the discretion of the Corporation such second mortgage would be permitted. This matter is discussed fully in Papazian v. Emerzian, 69 RI 443, 35 A2d 9, rehearing denied in 69 RI 483, 35 A2d 636. In Lavery v. Rizza, 126 Conn 132, 9 A2d 819, the rule is followed that where a second mortgage is taken after informing the Corporation that the reduction in the debt was to be covered by the second mortgage and the corporation with such knowledge refunded the mortgage and delivered its bonds the second mortgage is valid. Miners Sav. Bank v. Hart, 349 Pa 468, 37 A2d 570, follows the rule in the Walker v. Oakley Case holding that a secret agreement would render the second mortgage void and such is the holding in Murphy v. Plains State Bank, 157 Kan 530, 142 P2d 733, in harmony with Cook v. Donner, 145 Kan 674, 66 P2d 587, 110 ALR 244, supra.

Missouri follows this general rule that a second mortgage taken without the knowledge of the Corporation is void. Cannon v. Blake, 353 Mo 294, 182 SW2d 303, and at page 306 is a long list of authorities showing such lien valid when taken with the knowledge of the Loan Corporation.

This question of public policy was before the Supreme Court of Michigan in a matter where a note and chattel mortgage involved were executed in the same month as in the case at bar; and in Bay City Bank v. White, 283 Mich 267, 277 NW 888, the court holds:

"Where a mortgagee, though signing a mortgagee's consent to take bonds of the Home Owners' Loan Corporation for an amount loaned by that corporation, which consent contained a waiver of claims against the property of the mortgagor, took a note and chattel mortgage on other property for the balance of its claim, without fraud, secrecy, or collusion, and with knowledge of the corporation's representative, the note and chattel mortgage were not void as against public policy. Home Owners' Loan Act 1933, as amended, 12 USCA §§ 1461 et seq, [4 FCA title 12, §§ 1461 et seq]."

Some jurisdictions go to the extent of holding that a secret agreement made between the creditor and the debtor is valid, even though unknown to the Loan Corporation. In Krause v. Swanson, 141 Neb 256, 3 NW2d 407, we have a case where the transaction began in 1933, and shortly after the first of the year the vendor agreed to accept bonds under the same form of "consent" as in the case at bar, for the amount that was owing her. Despite the statement made by the vendor in her "consent," she entered into a contract with the vendee whereby the vendee gave her a second mortgage upon the property and this was done without the knowledge and consent of the Loan Corporation. The Nebraska court holds that such an agreement was not violative of the Federal Act of 1933 as, "the act fails to disclose anything even remotely bearing upon the question of further encumbering real estate after HOLC loan thereon . . . .

It shows: "They (the plaintiffs) ground their position on the proposition that the agreement violates the spirit of the act, denotes bad faith, is against public policy, and the note and mortgage so given are void."

It shows further that the plaintiff cited and relied upon the Kansas case of Cook v. Donner, 145 Kan 674, 66 P2d 587, 110

ALR 244, supra. But the Nebraska court takes the broad position that the rules and regulations promulgated under the federal act are for the guidance of the Loan Corporation and its agents in making loans and when the vendor agreed with the vendee to extinguish part of the indebtedness by taking bonds such consent to accept the bonds related only to the part of the indebtedness that was extinguished by the bonds and where the vendor and vendee agreed that the latter should give a second mortgage for the remainder there was no violation of any duty to the Loan Corporation; that "Where a person honestly owes a debt, and ought, in equity and good conscience, to pay it, there is a sufficient consideration for the execution of a note and mortgage given for payment of the debt." It quotes and adopts § 421 of the American Law Institute, Restatement of the Law of Contracts, and reaches the broad construction that such an agreement by the vendor and the vendee is valid even when made without the knowledge of the Loan Corporation and despite any broad interpretation given to the language of the "consent." To the same effect is McMillan v. Palmer; 198 Ark 805, 131 SW2d 943.

We cite these cases to show views in some jurisdictions, without adopting the principle in toto, for in the case at bar there was no secrecy.

Respondents cite Neavitt v. Upp, 57 Ariz 445, 114 P2d 900; Bealkowski v. Powers, 310 Ill App 662, 35 NE2d 386; Johnson v. Matthews, 301 Ill App 295, 22 NE2d 772; Council v. Cohen, 303 Mass 348, 21 NE2d 967; Pye v. Grunert, 201 Minn 194, 276 NW 221. These cases bear out the principles set forth in this opinion. For instance the Arizona case shows that, "a new note and second mortgage for difference between amount of original mortgage debt and reduced amount, which federal Home Owners' Loan Corporation agrees to loan mortgagor to settle indebtedness, are valid, if such corporation has notice of contemplated execution thereof and makes loan with such knowledge, but if it has no actual or implied notice thereof and parties have agreed to cancel balance of original debt, second mortgage and new note are void as against public policy."

This Arizona case is cited and approved in Empire Mortg. & Inves. Co. v. Bratton, 198 Ga 865, 32 SE2d 907, 909. The Georgia court states:

"A second mortgage taken contemporaneously with the execution of a first mortgage made to the Home Owners' Loan Corporation, created under the act of Congress known as Home Owners' Loan Act of 1933. 12 USCA, chapter 12, §§ 1461 et seq, [4 FCA title 12, §§ 1461 et seq] and as a part of the same transaction, with the full knowledge and consent of these officials of said Corporation handling the particular loan, the amount of the two mortgages not exceeding the value of the property according to the Corporation's appraisal thereof, is valid and enforceable."

Other cases refer to invalidity of such an agreement when the Loan Corporation has no knowledge, based on violation of public policy.

The Minnesota case dealt with a contract where the debtor agreed to pay the difference between the market value of the bonds received and the amount of indebtedness cancelled. See first opinion in 201 Minn 191, 275 NW 615.

Respondents cite these and other cases also to show the effect of an accord and satisfaction.

It will be noted that in this case at bar there is no allegation anywhere, nor any proof, of a separate agreement made between the debtor and creditor whereby the creditor was to cancel the remainder of the debt and thus enter into an accord and satisfaction, nor is accord and satisfaction pleaded.

The rule governing the case at bar is succinctly stated in Ridge Invest. Corp. v. Nicolosi, 15 NJ Mis R 569, 193 A 710; thus: "We are unable to agree with the contention of the appellants that agreements for payments over and above the amount of the Home Owners' Loan Corporation mortgage are entirely void and illegal. The most favorable view of the statute and the cases thereunder cited would be that fraudulent agreements, made in collusion to induce the granting of the mortgage loan by the corporation, are unenforceable. As stated, the factual finding here is that there was no fraud or collusion, and that the

arrangement was openly made with the knowledge of all parties, including the representative of the corporation."

The questions involved have created wide spread interest. Articles in 38 Mich LR 508 and 28 Cal LR 232, cover the subject admirably and show the evolution of these principles discussed.

There was no secrecy in the case at bar, nor any fraud. The stipulated facts and the exhibits—all of which are admitted by the defendants—show this conclusively. The situation differs radically from the one involved in the Koslofsky Case, 67 ND 322, 271 NW 907, supra.

In Holien v. Staveteig, 70 ND 36, 43, 291 NW 541, 544, we comment upon the fraud shown in this Koslofsky Case, show the action was brought by the one defrauded and how the unlawful act conspired to interfere with the attempt of the bank "to carry out this spirit of the law whereby debts were being adjusted to the mutual advantage of debtors and creditors." No such condition exists here. The Home Owners' Loan Corporation is not a party to this action and, so far as the record shows, is not concerned with the contention involved.

Defendants insist there was no consideration for the note and mortgage involved here. While it may be that a "mere moral obligation or conscientious duty arising wholly from ethical motives—unconnected with any legal obligation, perfect or imperfect, or with the receipt of benefit by the promisor of a material or pecuniary nature, will not furnish a consideration for an executory promise," as stated in the note 17 ALR 1302, yet as shown (17 ALR 1317, 1318), "It is well settled that a moral obligation arising from what was once a legal liability, which has become suspended or barred by the operation of a positive rule of law, will furnish a consideration for a subsequent executory promise." This is particularly so, "where there was an antecedent contract which originally created a legal liability which has been barred or discharged." (17 ALR 1333.) In the case at bar if the defendants were buying the home from the plaintiff, there was a binding duty to pay the purchase price. If the foreclosure proceedings and negotiations with reference

thereto were such the defendants could claim their rights were not extinguished by the foreclosure and that redemptive rights continued, there was nevertheless a moral obligation on their part to pay to the plaintiff the entire sum due it; and when they agreed to give a note and mortgage for the difference, and did so, they recognized their moral obligation to pay. We are not concerned here with whether the plaintiffs could have compelled them to do so.

The record shows no agreement between the parties that the plaintiff would cancel any part of the debt, so far as the defendants were concerned. This is not a case of reviving a debt. In Fellows Box Co. v. Mills, 86 NH 267, 167 A 153, 156, it is held that, "Promise to pay lawful debt which for reason other than payment or adjustment has been discharged is enforceable as equivalent of contractual consideration in renewal or restoration of debt." In the case at bar there was no "adjustment" between the parties here. There was a clear understanding that the debt was to be paid in full. As stated in the New Hampshire case the oral promise was not illegal.

In Straus v. Cunningham, 159 App Div 718, 144 NYS 1014, it is held, "Where a creditor has been compelled in voluntary proceedings to accept corporate stock in full settlement of an indebtedness which it does not in fact pay, a moral obligation survives which is a sufficient consideration for a subsequent promise to pay the deficiency."

The same case holds, "Where at the time of being released by a creditor upon making a payment in corporate stock which was less in value than his indebtedness, the debtor expressly recognized and reserved a moral obligation to pay notwithstanding such release, such reservation kept alive the obligation after release to the extent that it could furnish a sufficient consideration for a subsequent distinct promise to pay, even though the original settlement was voluntary."

In Taylor v. Hotchkiss, 81 App Div 470, 80 NYS 1042, the court had before it a case where debtors, in attempting to settle with creditors, offered to take certain securities at an arbitrary valuation of eighty per cent, the debtors having been obligated

theretofore to take such securities at their full valuation; and the debtors at the same time, "proposed to offer their obligation to take the securities back at 80 per cent." The creditors thereupon accepted the offer and it was held that this obligation to pay, as expressed in its promise was sufficient consideration to bind the debtor to the fulfillment of his agreement. This holding was affirmed by the New York Court of Appeals in 179 NY 546, 71 NE 1140.

In Baird v. Nicholson, 60 ND 566, 574, 235 NW 685, 689, we hold, in a case involving consideration for endorsement on promissory notes that, "The promise relied upon as consideration for the indorsements need not be made nor given at the time of the indorsements. If the indorsements be made in pursuance of a previous understanding the agreement there is sufficient consideration. There need not be any new consideration, for promisors may bind themselves by 'merging an oral agreement into the written contract, and cannot escape liability merely because the consideration had passed to the promisee prior to the execution of the written contract.'"

In Olsen v. Hagen, 102 Wash 321, 172 P 1173, it is held, that a pre-existing liability is a good consideration for a new promise, and this case is affirmed on rehearing in 105 Wash 698, 178 P 451.

Wisconsin holds that a "moral consideration will support executory promise, notwithstanding absence of pre-existing legal obligation to do thing promised, where promisor originally received from promisee something of value." Park Falls State Bank v. Fordyce, 206 Wis 628, 238 NW 516, 79 ALR 1339.

We hold that the "consent" must be interpreted in the light of all the facts known to the Loan Corporation; that it was well understood by the defendants and the Loan Corporation this second mortgage was to be given; that when the Loan Corporation with full knowledge of the intent of the parties, delivered its bonds, without any objection to a second mortgage being given it approved the arrangements made; that such second mortgage did not violate any principle of the Home Owners' Loan Act; that the second mortgage was given for a

364

pre-existing liability, which defendants agreed to and did recognize as not being extinguished; and the note and mortgage were based upon a valid consideration. Consequently we determine that this note and second mortgage are not void, and that the plaintiff is entitled to foreclosure. The judgment therefore is reversed.

CHRISTIANSON, Ch. J., and NUESSLE, MORRIS and BURKE, JJ., concur.